22-2085. Mr. Hotchkiss. May it please the court, Judge Hartz, Judge Ebel, Judge Carson, Mr. Obias. I'm Todd Hotchkiss. I represent Appellant Donald Tolbert who entered a conditional plea to multiple counts of receipt, possession, and distribution of material containing images of minors engaged in sexually explicit conduct. This is an appeal of the Ackerman motion to suppress and under Ackerman 1, there is no dispute that NCMEC is a government entity and there is no dispute in this case either on that point. There is also no dispute that NCMEC on September 5th of 2012. But there was a dispute whether NCMEC was a government organization at one point. Below, but not on appeal. Yes, I know, but I mean when it was being argued and decided below that was undecided, isn't that correct? Yes, I guess. Yes, that would be accurate. All right, well it might turn out to be important. Go ahead. There's no dispute that NCMEC opened the emails without a search warrant. Emails and attachments five that were received. Under Ackerman 1, opening those emails and Ackerman 1, either TAT's expectation of privacy or under the Jones physical trespass traditional notion of a search. So do you, I don't really understand the trespass argument. Is that necessary, essential to your argument or can we kind of, can I kind of put that off in a separate category? It is, it's important. All right. Is there any, the government isn't disputing that this search would violate Ackerman. The question is whether there are reasons not to apply it in this case because of no expectation of privacy in this case because it was inevitably discovered or under the good faith exception. Isn't that what the issue is about here? Correct, correct, but if under Jones, separate from the CAT's expectation of privacy, if the court were to rule under Jones on the physical trespass theory, then it would be a search. The evidence was, according to Mr. Sheehan's testimony, the only NCMEC witness who testified was that after the analyst who did not testify opened the emails and attachments on September 5th that thereafter the rest of the investigation done by that NCMEC analyst occurred. We would submit that that would be fruit of a poisonous tree. The question would then become, as the discovery, or the good faith exception, pardon me, or the good faith exception, or the good faith exception. Why don't you start with good faith exception? That seemed to be your biggest hurdle. Okay. The good faith exception is supposed to be narrowly by this court under the cost decision. In this case, the searches occurred on September 5th, 2012. There were additional searches for the two emails that originated, the two AOL reports that originated in July and August but were not opened until after September 20th of 2012. And so I don't have, and there was no case law at the time that the search occurred that held that NCMEC was a government entity. And these searches were going on regularly, maybe every day. That is correct. Anybody thought to think that this institution was an agent of the government? Well, at least the police did not, and at least NCMEC did not. However... Or defense attorneys apparently didn't because they weren't raising these issues. Yes, there was no case law at the time. The Ackerman one did not reverse any case law in finding that it was a government entity. And that's why the court has relied on a general acceptance notion of the searches being authorized under the statute even though the statute does not expressly authorize warrantless searches. So what's wrong with that argument? Well, what's wrong with that, Your Honor, in this particular case is we have the testimony of Agent Pena, who was the affiant of the search warrants and the chief investigating officer. He was the affiant of the search warrants that were executed on September 20th. And Agent Pena testified at the hearing that based on his training, that he knew that to search a letter in the mail, he needed a search warrant. To search somebody's cell phone, he needed a search warrant. In this case in Ackerman, this court in Ackerman one in evaluating the privacy rights and whether this was search analogized to those things. Well, but there's another line of cases that's relevant here. I'm not sure his personal thinking is relevant as opposed to an objective test. But there's also a line of cases saying if a private entity provides me information, it doesn't matter how the private entity got that information. And presumably the officer knew that too. And that was the basis for people thinking it was okay to do what was done here in Ackerman, wasn't it? Possibly. The agent testified that this was not just his subjective opinion, but was based on his training and knowledge as a law enforcement officer, which of course is the standard to any reasonably well-trained officer would have known. And his testimony was that on very analogous things that this court found that in Ackerman, using the language of this court, that you easily recognized that NCMEC was a government entity. That it was hard to see how we could not avoid. And well, pretty obviously a search. When you say that NCMEC was easily recognized as a government entity, you're saying the officer said that that was his understanding? No, I'm saying that because the court, the linchpin I think of this is that whether the law enforcement officer knew that NCMEC was a government entity. And the court in Ackerman 1 used that language to pretty obviously it was a search by saying that emails are a virtual container that contain lots of personal and private details. And that's why this court in Ackerman 1 found that that was a search in that case. And we would submit that it controls this case as well. So I think the argument then is that the officer could not in good faith have thought that NCMEC was a private entity. Yes, because that's involved in the officer. Even though everybody thought that before Ackerman. Well again, the court did not reverse any case law in Ackerman 1. Police were doing whatever they were doing. And they were accepting that that's the way that they wanted to interpret the statute. Even though comparing it to the statute for instance in Kroll, which expressly authorized warrantless searches, this one did not. The police in enforcing the statute proceeded on. And police in NCMEC. How many people do you think had been prosecuted at that time before Ackerman based on evidence obtained through NCMEC as it was in Ackerman? I have no idea, Your Honor. Don't you think it was a lot? Pardon me? Don't you think it was a lot of cases? I have no idea. Couldn't have no idea. Before you're done, could you also speak to the inevitable discovery? Sure. That's an important one. Sure. Yes, I will, Your Honor. The inevitable discovery I believe is rooted in law of the circuit is that any evidence that comes as a result directly or indirectly from the exploitation of an underlying illegal search must be deemed to be through the poison history. The inevitable discovery argument in this case, in my opinion, from the record evidence ends with after the images are opened. And the NCMEC analyst then proceeds on to do the rest of his investigation. But I thought the district court conducted an inevitable discovery analysis not relying on evidence after the emails were opened. He had quite a long list in his opinion about things that would inevitably have tumbled. And he didn't, I don't believe, relied on what was discovered when NCMEC opened the email. The agent testified that the crux of the subpoenas subsequent investigation he did was the opening of the emails. The crux of the probable cause basis for his warrants that were executed on September 20th was that he had opened the emails. Mr. Sheehan's testimony from NCMEC was that after the analyst who didn't testify opened the emails, that analyst then did the rest of that investigation. But they were doing, wasn't there some kind of an investigation under advisement or starting in any event? The only investigation of record, your honor, is the one that starts with NCMEC and that's it. NCMEC has no independent way of contacting law enforcement otherwise than through the virtual private network. And AOL has no other way of contacting law enforcement. So there is, the agents testified not to historical facts as this court wants to review, to apply the inevitable discovery doctrine, but instead speculated about what they would have done. If the testimony of Mr. Sheehan was that NCMEC analysts have discretion to either to engage in public source and open source searches. Without the if that analyst could not have opened the attachments and the emails. Also, Agent Pena testified that the person who controls the VPN at the New Mexico Attorney General's office has the discretion to close out an investigation. That person did not testify either. So I don't believe that there is sufficient evidence in this record that any determination of inevitability can occur when we have two non-testifying analysts who have discretion to end investigations and they didn't testify. What is our standard of review when a district judge finds inevitable discovery? You have to take the facts in the light most favorable to the decision. Factual findings are reviewed for clear error and I believe you review inevitable discovery for reasonableness, I believe. So we would, I submit that the determination that this was inevitable with the undisputed testimony of discretion with both of the non-testifying analysts who controlled the virtual private network on the front end of the investigation to say that it's inevitable in this case is way too speculative and not rooted in any historical facts. The other fact, the other point, if I may go back to good faith, Your Honor, I just wish to state that I understand this court's decision in the unpublished decision in Ackerman 2 regarding good faith and relying on Kroll and the statute in Kroll. Something that I think is very fundamental dimension that was not even addressed in the unpublished decision and I believe that really distinguishes the statute in Kroll from this statute is the per se quality of an unreasonable search without a warrant. And so when you have the statute in Kroll that authorizes a warrantless search, the per se notion of a warrantless search makes the statute in this case which did not expressly authorize warrantless searches different. And it's a very important difference. Thank you, counsel. Thank you very much, Mr. Ubaez. Good morning and may it please the court. My name is Alex Ubaez. I'm the United States Attorney for the District of New Mexico. I represent the United States in this matter against Donald Tolbert. Good morning, Your Honors. Thank you for joining us, counsel. And may it please the court. This is a matter that involves pre-Ackerman, in fact, pre-Ackerman factual basis search by NCMEC of seven emails which were intercepted by NCMEC pursuant to the manner in which they understood their statutory authority that cascaded as this court described it into an investigation identifying Donald resulting in the convictions that bring him here today. There are three matters which are before this court for decision. Of course, the easiest one is going to be good faith. And Mr. Tolbert's going to really struggle to distinguish himself from Walter Ackerman in this matter because this was an investigation in 2012 before the Ackerman investigation itself had even begun in 2013. And as this court identified, it's an investigation pursuant to the understood statutory scheme that authorizes NCMEC's role in the investigation as a clearinghouse of child sexual exploitation material. And so what this court acknowledged in Ackerman... How did that understanding get dispersed throughout law enforcement around the country? I mean, there wasn't any opinion on it. How did that get widely dispersed as a way to go? Your Honor, I'm not sure that the record reflects exactly how this spread through through NCMEC as their understanding. I think the analysis... They all dealt with NCMEC and if that was their understanding, I guess that was the commonality was their connection with NCMEC. Yes, I think now Supreme Court Justice Gorsuch acknowledged sort of this was the common understanding in NCMEC of what its duties were and its authorizations. I think some of it can be drawn from the fact that they're excluded statutorily from any liability, civil or criminal. And as Ackerman one describes specifically from the statutes that prohibits the possession, the viewing, the distribution, and the receipts of child pornography. And so perhaps it's there in that statutory exemption. Perhaps, although I found that a very unpersuasive authority myself, but nobody challenged it. I'm kind of amused about that, but go ahead. Judge Ebel, as the through line to the Ackerman saga here, I appreciate your discussions in Ackerman. I do know, I will say that in factually, it was the understanding as this court has identified in many, many cases that came before many, many district courts leading up to the decision in 2016 in Ackerman. And so with that finding from this court that this was the common understanding. And I think looking at the statute too, you can see explicitly not no longer being liable, criminally or civilly, as well as if you look at some of the language, I think it's in 2258D, ordering NICNIC when they are possessing these images to, at the time, reduce the amount, minimize the access to the visual depictions themselves amongst their staff, almost implicitly suggest that there will be access to the visual While it's a fair point, the facts of how NICNIC was interacting with these cases pre-Ackerman established that there was a common understanding. And beyond that, really, when we're looking at good faith, this court's rationale comes down to whether or not there is a deterrence rationale for this court to suppress. And so regardless of whether we had a very high level statutory interpretation at the NICNIC reviewer level, this court can be assured based on the record here in Ackerman that the changes from NICNIC, which happened immediately after Ackerman came down, suggest there is no deterrence rationale for suppressing evidence that was pursued and viewed in line with what they understood to be a common statutory scheme. So is it your argument that the deterrence factor drops away when the alleged offending party, NICNIC, changes its approach or the people change it as pertaining to NICNIC? No, Your Honor, it doesn't. Of course, the deterrence approach here that this court evaluates. That's an interesting argument. The parties have changed themselves, and so that weakens deterrence. I've never heard that argument before, and I'm just curious about it, if you have any authority to support that or if that's, in fact, not an argument you're really making. No, Your Honor, I don't have the authority to support the idea that a subsequent change in practice would support a previous lack of suppression. I do think it does lie, really, in what Ackerman 1 found, which is this commonly understood statutory scheme that many, many cases follow. I have a question for you about the record. Do you know off the top of your head what the precise language was in the AOL user agreement as to what rights the defendant gave to AOL? Yes. No, I don't know off the top of my head the precise language. I know that in the privacy policy that AOL sent to Donald Tolbert for accessing every one of these email accounts, it did include both that he had a right to privacy and that they reserved the right to access those emails and the contents if they had a reason to believe, a good faith reason to believe, that they contained contraband. And that they could and would share that information with law enforcement. That's in the privacy agreement. That specificity, as a reader, that would stick out in my mind way more than an earlier platitude about you've got rights and privacy. Yes, Your Honor, and I think it is, I think we can read it as a fair exception, which is within the same documents that he was provided and every AOL user is provided as a term of use, a requirement, a term of use of any of the email accounts themselves, which does bring us sort of to the reasonable expectation of privacy, which we, which, and this was addressed by the courts and in a follow-on order after a motion to reconsider in a footnote, but they did find that looking at those terms explicitly in AOL does suggest that there's a lesser expectation of privacy in those emails once they contain contraband, as explicitly termed out in AOL's terms of service, citing a couple other district court who have found the same. And then of course in our brief to this court, we drop in, I think, footnote 11, a site to the fifth and sixth circuits, who've gone a step further here in this analysis. What they've done is they've looked at the hash value matches themselves as being the private search. So on the basis, and this court has already found in Henderson back in 2010, that the hash value matches are basically a DNA pixel for pixel representation of what is in the image. And so what the court stood there, and I think it's on page 27 of our brief, footnote 11, the Fifth Circuit and Sixth Circuit and Reddick and Miller found that that hash value match itself was equivalent to a private search, because once we start with the premise that we understand the photo DNA in that case, or the hash value match in this, is a one-for-one guarantee better than DNA, that these are the same image or same media file, then the private search has already happened of the image, and therefore opening the image subsequently is not an expansion. Okay, so that's going in an area where I was just thinking about, and I guess what I'm curious about is the timing of things. If AOL has the right under the terms of service to provide the emails to law enforcement, if they have reason to believe they contain illegal material, I mean, does it matter that AOL didn't look at these before they sent them over? It sounds to me like the crux of your argument is that they may not have opened the emails, but they did look at them insofar as they did the hash value search. Correct, that's correct, Your Honor. That's the argument we're trying to reach towards the end of our brief, referencing Jefferson and then the previous, the analogs we're drawing to Creighton and Banks, this court's decisions regarding hotel rooms, which is essentially that, which is once he's violated these terms of service, these accounts are seized, which is analogous sort of to the term of your lease of your hotel room running or being evicted from that hotel room, as the court previously found. You no longer have a reasonable expectation of privacy in its contents. Those are now seized from you and no longer belong to you. So that, yes, yes, Your Honor, that's a component of the reasonable expectation of privacy argument in addition to the terms of service and the privacy agreement that he signed, which explicitly warned him, on top of all of which, there is his own admissions to the website that he accessed and used, that his two email accounts had previously been canceled because his... When he made that statement in the email, all these other actions which the defendant is saying are improper, those have already occurred, haven't they? I mean, when he said my account's been, has been into and so forth, the course was already out of the barn by then, wasn't it, in terms of the investigation against him? It's sort of a funny posture, Your Honor. So there were seven different emails, as you might recall. The first was July 17th of 2012, the second, August 7th of 2012, and those two were not challenged below, right? And so those two email accounts and those two emails were flagged, were stopped, contained child pornography, but were not challenged on acrimon established... I mean, I can't remember those two precisely, but was that, for inevitable discovery, does that get the ship sailing pretty far? We believe so, Your Honor. After that, on September 1st, was the five that were then intercepted, which were then being challenged here before the district court and this court today. But in terms of timeline, what happened was on August 9th, so following the interception of the second email, which came from... So the first email on July 17th came from dat666 at AOL. The second email on August 7th came from abc123ddt. And then on August 9th, he registers a brand new account, ddt123abc. I know they're very similar. And this is the one that is located on ImageSource... I mean, sorry, the ImageSource.ru website that we've been discussing about his email accounts being canceled. And so the inference here is that when the two email accounts that he is referencing are the two email accounts that were shut down on July 17th, like August 7th, and the new email account that he created, the one that is at issue in the September 1st five emails, ddt123abc, was the new email account he had created after the first two were canceled. And so the first two, Your Honor, to get to your question of inevitable discovery, the first two in their headers alone, from private searches conducted by AOL provided to NCMEC, provide enough for law enforcement to identify Donald Tolbert as a resident of New Mexico, as a prior sex offender, and by his own admissions. So the second email, August 7th, 2012, the subject line of it references that website that I've been talking about, ImageSource.ru, and his profile name, Young Muff Man. Looking that up, you find Donny T. with a date of birth, 6-6-99, who states in that profile that he likes young girls ages five to 15, or eight to 15, excuse me. And that's the same one, of course, where he also says AOL searches emails. And so from this information... What's that information? I mean, we're only talking about whether they could discover who he was, they had his name, and where he was located. They knew generally that, and he had a record. It couldn't have possibly been all that difficult to locate him. That's our argument, Your Honor, exactly, which is that from those first two emails alone, setting aside the other five, any law enforcement agent would have located Donald Tolbert, identified him, and put him in New Mexico. Furthermore, based on the image hash searches that were attached to both of those first two emails, they would have had probable cause to go to a court for a search warrant that child pornography was attached to those two emails. And so, yes, it is an independent manner in which we would reach the same conclusion that we are here today of identifying Donald Tolbert as a sender and receiver of child pornography. And so, in addition on the inevitable... I just want to address one quick issue here on inevitable discovery. This court had asked what the standard would be. Of course, it's a preponderance of the evidence. It's a preponderance of the evidence in support of this preponderance supporting probable cause, because nearly within a month, I think, of the Ackerman decision itself, the United States sought a brand new search warrant, which issued on September 30, 2016, explicitly citing to Ackerman, explicitly including the additional analysis regarding hash cash values, and explicitly seeking for the ability to search. And so, our argument is on three bases. First, the good faith that this court knows. No courts... While it may have been easy for a future Supreme Court justice to determine that NCMEC was a government agency, that same level of analysis, I think, would struggle to apply to the NCMEC analysts themselves. Second, that inevitable discovery through multiple paths, including the one we just described with the two emails, that are not being challenged here, as well as the fact that the hash value matches themselves would have served a sufficient probability without anybody ever opening any image on the law enforcement side or the NCMEC side. And finally, that there's no reasonable expectation of privacy to do the three things that I identified, which are first, the terms of service and the privacy policy. Second, through his own words and his own posting, that he knew that his accounts were being shut down because he was sending a bunch of them. And finally, because his reasonable expectation of privacy terminated upon a seizure of his accounts by AOL. And so, if there are no further questions, I'll see back the balance of my time, which will expire in two seconds. Did you handle this personally as an AUSA? Yes, Your Honor. This was my case in the trial courts. I argued these notions and I'm here to see it to the end. Thank you. Thank you. Thank you, counsel. Case is submitted. Counsel are excused.